[No. 2528–3. Division Three. November 8, 1978.]

*In the Matter of the Application of*
WILLIAM SAGE, *Appellant.*

*Philip W. Dufford* and *Jeffrey H. Hartje* of *University Legal Assistance,* for appellant.

*James McNally, Prosecuting Attorney,* and *James B. Roche, Deputy,* for respondent.

McInturff, J.—This appeal results from denial of a petition by an adopted child, now an adult in his early 30's, for permission to inspect adoption records sealed pursuant to the Washington State Adoption Act.

Appellant, William Sage, lived with his natural parents until the age of 5, when he was taken from his home by the Department of Social and Health Services. He, along with his brother and sister, was subsequently adopted by Mr. and Mrs. Sage. At present, Mr. Sage is married and has two children. In July 1976, he went to the county clerk seeking access to his adoption records, and upon refusal, he brought this action to establish his discovery rights.

Mr. Sage wishes to inspect his adoption records because he feels an "inner compulsion" to reacquaint himself with

his natural family. He is also concerned that his natural father may have died of hereditary heart disease.

This petition raises very sensitive issues upon which there is a conflict of opinion.[1] In recent years, national attention has been called to the plight of adult adoptees articulating their desire to learn about their genealogical background. Many adoptees have a compelling need to learn about their natural family and are presently seeking ways to satisfy that need. To those of us who are not adopted, it is perhaps difficult to understand the need many adoptees have to discover their "roots." We enjoy our family get-togethers and share a common bond with our relatives through knowledge of our ethnic background. Many adopted people cannot share in these pleasures. Perhaps we take for granted knowledge of the identity of our parents, grandparents, brothers and sisters, etc. Adopted persons who lack such fundamental information may indeed suffer a kind of genealogical bewilderment.

Statutes providing for the confidentiality of adoption records have become the subject of recent controversy. Increasingly, adult adoptees are demanding biographical information from the adoption agencies, and a movement is now afoot which is aimed at the repeal of the sealed records statutes.[2]

In the adoption context, our courts are directed to make

[1]Recent articles on this subject include: Lupack, *Sealed Records in Adoptions: The Need for Legislative Reform*, 21 Catholic Lawyer 211 (1975); Prager and Rothstein, *The Adoptee's Right to Know his Natural Heritage*, 19 N.Y. Law Forum 137 (1973); Burke, *The Adult Adoptee's Constitutional Right To Know His Origins*, 48 S. Calif. L. Rev. 1196 (1975); Klibanoff, *Genealogical Information in Adoption: The Adoptee's Quest and the Law*, 11 Family Law Quarterly 785 (1977); Sheppers, *Discovery Rights of the Adoptee—Privacy of the Natural Parent: A Constitutional Dilemma*, 4 San Fernando Valley L. Rev. 65 (1974); 83 A.L.R.3d 800 (1978); J. Goldstein, A. Freud, A. Solnit, *Beyond the Best Interests of the Child* (1973).

[2]The A.L.M.A.—Adoptees' Liberty Movement Association—is an organization of approximately 1,800 members, and is in the forefront of this movement. To our

decisions consistent with "the best interests of the child."[3] The sealed records statutes are a codification of that directive. Confidentiality encourages and facilitates preadoption investigation and helps to strengthen the adoptive family as a social unit. *The Adult Adoptee's Constitutional Right To Know His Origins,* 48 S. Calif. L. Rev. 1196, 1199 (1975). Nevertheless, we must also keep in mind that the adopted child eventually becomes an adult, and one may question whether continued confidentiality remains in the adoptee's best interests once he reaches majority. Although the "best interests of the child" is an important guideline in adoption proceedings, we must also be sensitive to the interests of others who are intimately involved in an adoption—the natural parents, the adoptive parents, and the state.

The interests of the natural parents are not likely to be furthered if information regarding their identity and background is indiscriminately disseminated. Many parents chose the course of adoption, as opposed to abortion or black marketing, in reliance upon the statutory guaranty of anonymity and confidentiality. In addition, the private lives of the natural parents should be protected from the disruptive and traumatic effect that may result from the sudden reappearance of a child formerly given up for adoption.

The adoptive parents have interests deserving of our consideration as well. The adoptive parents should be given the opportunity to create a stable family relationship free from unnecessary intrusion. A strong family unit will serve both the adoptee and the adoptive parents. While the adoptive parents lack a biological link with their adopted child, their emotional involvement is no less real. Thus, serious consideration should be given to these interests before adoption information is made public.

---

knowledge, only two or three states have granted the adoptee access, as a matter of right, to birth certificates and adoption records: Alabama, Kansas and Virginia.

[3]*In re Adoption of Lybbert,* 75 Wn.2d 671, 674, 453 P.2d 650 (1969); *In re Adoption of Hamilton,* 41 Wn.2d 53, 56, 246 P.2d 849 (1952); *In re Adoption of Potter,* 85 Wash. 617, 620, 149 P. 23 (1915); *Knight v. Gallaway,* 42 Wash. 413, 414, 415, 85 P. 21 (1906).

Finally, there is the interest of the state, or public interest, in maintaining the integrity of the adoption process. The state's interest has been described as follows:

The primary interest of the public is to preserve the integrity of the adoptive process. That is, the continued existence of adoption as a humane solution to the serious social problem of children who are or may become unwanted, abused or neglected. In order to maintain it, the public has an interest in assuring that changes in law, policy or practice will not be made which negatively affect the supply of capable adoptive parents or the willingness of biological parents to make decisions which are best for them and their children. We should not increase the risk of neglect to any child, nor should we force parents to resort to the black market in order to surrender children they can't care for.

*Genealogical Information in Adoption: The Adoptee's Quest and the Law,* 11 Family Law Quarterly 185, 196 (1977).

With this background, we address the contentions of the parties. Initially Mr. Sage argues that he has an absolute right to inspect his adoption records by virtue of RCW 26.32.150—the sealed records statute. In looking at its legislative history, we find that when RCW 26.32.150 was originally enacted in 1943, it read:

Unless otherwise requested by the *adoptor,* all records of any proceeding hereunder shall be sealed and shall not be thereafter open to inspection by any person except upon order of the Court for good cause shown, and thereafter shall be again sealed as before.[4]

(Italics ours.) In 1955, only the first phrase of this statute was amended. It now reads: "Unless otherwise requested by the *adopted,* . . ."[5] (Italics ours.) According to Mr. Sage, by changing *adoptor* to *adopted,* the legislature gave the latter an absolute right to inspect his adoption records. In addition, Mr. Sage states that the phrase "unless otherwise

---

[4]Laws of 1943, ch. 268, § 13, codified as RCW 26.32.150.

[5]Laws of 1955, ch. 291, § 15, codified as RCW 26.32.150.

requested by the adopted" is the controlling legislative declaration and an explicit grant of inspection rights to the adopted.

■■ Two basic rules of statutory construction guide us in the interpretation of RCW 26.32.150. First,

[A] statute should be construed as a whole in order to ascertain legislative purpose, and thus avoid unlikely, strained or absurd consequences which could result from a literal reading. That the spirit or the purpose of legislation should prevail over the express but inept language is an ancient adage of the law.

*Alderwood Water Dist. v. Pope & Talbot, Inc.,* 62 Wn.2d 319, 321, 382 P.2d 639 (1963). Secondly,

Statutes in *pari materia* must be construed together. Statutes in *pari materia* are those which relate to the same person or thing, or the same class of persons or things; and in construing a statute, or statutes, all acts relating to the same subject matter or having the same purpose, should be read in connection therewith as together constituting one law. The object of the rule is to ascertain and carry into effect the intent of the legislature, and it proceeds upon the supposition that the several statutes having to do with related subject matters were governed by one spirit or policy, and were intended to be consistent and harmonious in their several parts and provisions.

*State v. Houck,* 32 Wn.2d 681, 684–85, 203 P.2d 693 (1949).

■ The State's interest and the legislative purpose of our present adoption act is three–fold: protection of the adoptive child, the natural parents and the adopting parents. *In re Adoption of Reinius,* 55 Wn.2d 117, 121, 346 P.2d 672 (1959). There is also a legislative policy of confidentiality. Making adoption records confidential except upon a showing of good cause represents a thoughtful balance between several important interests. Confidentiality encourages the development of the adoptive family as a stable social unit. The principle of confidentiality also demonstrates respect for the right of privacy of the natural parents. At the same time, when the interests of the

adopted child demand disclosure, the information can be obtained under the good cause standard.

We believe that RCW 26.32.150 accurately reflects the legislative purposes and policy. As we interpret the statute, it is intended that all adoption records be sealed at the conclusion of the adoption hearing. However, the statute does give the adopted child the right to request that the records remain unsealed. For example, sealing adoption records may serve no purpose in adult adoptions. The adopted child may have other reasons as well for making this request, *i.e.*, tax purposes. If no request is made at the time of the adoption hearing, the records are sealed and *thereafter* the records may not be opened unless good cause is shown. These records are intended to be confidential at all times and disclosure is the exception.

 The policy of confidentiality is reflected in several other sections of the adoption act. Contrary to the contention of Mr. Sage, confidentiality and not absolute disclosure is the controlling legislative declaration. For example, RCW 26.32.120 provides that the decree of adoption shall be secret unless otherwise provided by the court.[6] RCW 26.32-.100 provides that the hearing pursuant to an adoption shall not be public.[7] RCW 26.32.260 provides that all copies of preplacement reports and all information upon which they are based is confidential and closed to public inspection except upon order of the court.[8] RCW 70.58.210 provides for the issuance of a new birth certificate upon an

---

[6]RCW 26.32.120: "If the decree is for adoption, it shall provide:
". . .
"(2) That the records of the registrar shall be secret unless otherwise provided by the court, and the same shall be disclosed only upon order of court for good cause shown;"

[7]RCW 26.32.100:
"No decree of adoption shall be granted without a hearing thereon, whether the report of next friend is favorable or adverse. All such hearings, as well as any hearing incidental to an adoption, shall not be public unless specially ordered by the court."

[8]RCW 26.32.260:

adoption and the Bureau of Vital Statistics is directed to make no reference to the adoption when it issues a birth certificate and the names of the new parents are to be inserted.[9] If, as Mr. Sage contends, he has an absolute right to inspect his adoption records, why do these statutes restrict access to the contents of the adoption decree, the adoption hearing, the preplacement study, and the new birth certificate? To construe the sealed records statute as Mr. Sage contends would render these other statutes inconsistent and superfluous. We presume that the legislature does not enact statutes which are unnecessary or meaningless. *Knowles v. Holly*, 82 Wn.2d 694, 704, 513 P.2d 18 (1973).

When we construe these statutes together and we consider the purposes behind the adoption act, we have no hesitation in holding that pursuant to RCW 26.32.150, adoption records once sealed must remain sealed unless good cause is shown. Furthermore, we believe that this issue deserves additional careful study before the policy of confidentiality is abandoned, and that ultimately the decision should come from the legislature.

▮ Because we hold that the adoptee has no absolute right to require disclosure of adoption records, we face the alternative issue of whether there is "good cause" for the disclosure of adoption information in this instance. There is no precise definition of "good cause" either by statute or case law, rather, the judge must make this determination

---

"(2) The agency shall keep the preplacement study, the report, and all information upon which it is based confidential and closed to public inspection, except upon an order of the court for good cause shown."

[9]RCW 70.58.210:
"Whenever a decree of adoption has been entered declaring a child, born in the state of Washington, adopted in any court of competent jurisdiction in the state of Washington or any other state, a certified copy of the decree of adoption shall be recorded with the proper department of registration of births in the state of Washington and a certificate of birth shall issue upon request, bearing the new name of the child as shown in the decree of adoption, the names of the foster parents of the said child, age, sex, date of birth, but no reference in any birth certificate shall have reference to the adoption of the said child."

on a case–by–case basis. Flexibility is desirable in this sensitive area. The court is vested with wide discretion in adoption matters, and its orders and judgments should not be disturbed on appeal except for very cogent reasons. *See In re Adoption of Hamilton,* 41 Wn.2d 53, 56, 246 P.2d 849 (1952).

The record indicates that the judge gave serious and sincere consideration to Mr. Sage's petition and tried to accommodate the various conflicting interests. The court informed Mr. Sage that it would be willing to disclose the requested information if there was good cause shown. He was requested to supply the court with an affidavit setting forth more detailed information regarding his concern over the possibility of hereditary disease. However, no affidavits were forthcoming. Secondly, the court indicated that it would allow a disclosure of the requested information if it was with the consent of the adoptive parents or the natural parents. At least one of the adoptive parents requested that the information remain secret. Based on these facts, we agree with the court that Mr. Sage has not established the good cause necessary to require disclosure of the identity of his natural parents. The potential disruption and emotional distress which could result from indiscriminate disclosure outweigh Mr. Sage's request for information regarding his "roots."

█ Next Mr. Sage contends that full disclosure of adoption records is mandated by the public disclosure act, RCW 42.16. This argument is without merit. According to *State v. (1972) Dan J. Evans Campaign Comm.,* 86 Wn.2d 503, 508, 546 P.2d 75 (1976), the purpose of the public disclosure act is to:

> ferret out . . . those whose purpose is to influence the political process and subject them to the reporting and disclosure requirements of the act in the interest of public information.

The act is specifically addressed to public officials and lobbyists. To construe the public disclosure act as requiring disclosure of appellant's adoption records would frustrate

the historical policy of confidentiality in the area of adoptions.

■ ■ Lastly, Mr. Sage contends that the sealed records statute denies him equal protection under our state and federal constitutions. According to Mr. Sage, it is irrational to classify adult adoptees together with minor adoptees for purposes of regulating access to adoption records; that classification is similar to the classification of illegitimacy, as it is involuntary and dependent upon a status attained at birth. Mr. Sage also contends that the classification is not rationally related to the purpose of the statute. We disagree.

> Equal protection of the law . . . forbids all invidious discrimination but does not require identical treatment for all without recognition of difference in relevant circumstances.

*Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n,* 83 Wn.2d 523, 528–29, 520 P.2d 162 (1974). Except in the case of a suspect classification or when a fundamental interest is involved, equal protection of the law is provided if a rational relationship exists between the legislative classification and a legitimate state interest. *Childers v. Childers,* 89 Wn.2d 592, 604, 575 P.2d 201 (1978).

> The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the state's objective.

*McGowan v. Maryland,* 366 U.S. 420, 6 L. Ed. 2d 393, 81 S. Ct. 1101 (1961); *Haddenham v. State,* 87 Wn.2d 145, 150, 550 P.2d 9 (1976).

We find that the policy of confidentiality exemplified in the sealed records statute is rationally related to the state's objective of maintaining the integrity of the adoption process. While adoptees may argue that their interests are better served by disclosure, the sealed records statute serves other interests as well. In fact, an adoption resembles to some extent a four–way contract between the state, the natural parents, the adoptive parents and the adopted child, and all of these interests are thought to be served by

the policy of confidentiality. The respondent accurately described the state's objective in this way:

The state's interest in the instant case is closely interwoven with this privacy interest of the natural and adoptive parents. Basically, the state's interest at this point is to protect the integrity and sanctity of adoptions. The state as *parens patriae* has an affirmative duty to protect abused and neglected children. An assential [*sic*] aspect of this protection is assuring that parents of unwanted children can relinquish them for adoption quickly and secretly, and that their decision to do so remains secret in the future. The state, furthermore, must insure that there continues to be a ready supply of qualified people who wish to adopt children in unfortunate circumstances. A primary purpose of the confidentiality of adoption proceedings and records is the protection of the adopted family from future intrusion from the natural parents as well as any embarrassment from public knowledge stemming from the adoption.

Brief of Respondent, at 17–18.

We find no unconstitutional classification or discrimination in the sealed records statute, and we find the legislative policy of confidentiality to be consistent with the overall purpose behind the adoption act. In this connection, we adhere to the reasoning of the Missouri court when it said:

In developing the system, the legislature perceived a need for confidentiality of the records and the adopted child is not singled out and he alone prevented from perusing the records, instead the prohibition applies equally to the parents (adoptive or natural) or a curious interloper seeking to invade the sanctuary provided by the statute. None should be permitted to exploit the record of tragic events which necessarily find their way into many adoption proceedings. The interest of the state in protecting all concerned and in maintenance of a viable system of adoption is the manifest purpose of the statute. This system presents no invidious discrimination or denial of constitutionally protected rights . . .

*Application of Maples,* 563 S.W.2d 760, 765 (Mo. 1978).

814

Judgment of the Superior Court is affirmed.

GREEN and ROE, JJ., concur.

Reconsideration denied January 16, 1979.

Review denied by Supreme Court April 20, 1979.