WIGGINS, J. (dissenting)
¶ 39 Special sex offender sentencing alternative (SSOSA) evaluations contain "health care information" and that information is exempt from disclosure under the Public Records Act (PRA), chapter 42.56 RCW. In addition, the trial court did not err by allowing John Does G, I, and J (John Does) to proceed in pseudonym. For these reasons, I cannot join the majority's opinion and respectfully dissent.
I. The PRA exempts health care information from disclosure
¶ 40 "The primary purpose of the PRA is to provide broad access to public records to ensure government accountability." City of Lakewood v. Koenig , 182 Wash.2d 87, 93, 343 P.3d 335 (2014). An agency must disclose responsive public records "unless the record falls within the specific exemptions of [the PRA] ... or other statute." RCW 42.56.070(1). "Consistent with its purpose of disclosure, the PRA directs that its exemptions must be narrowly construed." Koenig, 182 Wash.2d at 94, 343 P.3d 335 ; see also RCW 42.56.030.
¶ 41 Relevant here, the PRA exempts "health care information" under chapter 70.02 RCW from disclosure. RCW 42.56.360(2) ("Chapter 70.02 RCW applies to public inspection and copying of health care information of patients."). Thus, any health care information that is not available under chapter 70.02 RCW is not subject to disclosure under the PRA.
¶ 42 Chapter 70.02 RCW, commonly referred to as the Uniform Health Care Information Act (UHCIA), governs the release of health care information in various circumstances. At the time of the statute's passage, the legislature *205 made several findings about the importance of protecting the privacy of health care information:
The legislature finds that:
(1) Health care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy, health care, or other interests.
....
(3) In order to retain the full trust and confidence of patients, health care providers have an interest in assuring that health care information is not improperly disclosed and in having clear and certain rules for the disclosure of health care information.
*1167 (4) Persons other than health care providers obtain, use, and disclose health record information in many different contexts and for many different purposes. It is the public policy of this state that a patient's interest in the proper use and disclosure of the patient's health care information survives even when the information is held by persons other than health care providers.
RCW 70.02.005. Thus, unlike the PRA, the UHCIA carries a general presumption of nondisclosure without a patient's written authorization. See, e.g., RCW 70.02.020(1) ("Except as authorized elsewhere in this chapter, a health care provider, an individual who assists a health care provider in the delivery of health care, or an agent and employee of a health care provider may not disclose health care information about a patient to any other person without the patient's written authorization.").
¶ 43 "Health care information" is "any information, whether oral or recorded in any form or medium, that identifies or can readily be associated with the identity of a patient and directly relates to the patient's health care." RCW 70.02.010(16). "Health care" is "any care, service, or procedure provided by a health care provider: (a) To diagnose, treat, or maintain a patient's physical or mental condition; or (b) That affects the structure or any function of the human body." RCW 70.02.010(14).
*206 A. SSOSA evaluations contain information that is directly related to a patient's health care.
¶ 44 Here, the majority concludes that there is no health care information in a SSOSA evaluation. Majority at 1159. Specifically, the majority concludes that SSOSA evaluations are not " 'directly relate[d] to [a] patient's health care.' " Majority at 1161 (quoting RCW 70.02.010(16) ) (second alteration in original). However, SSOSA evaluations contain a wealth of information that directly relates to an individual's health care.
¶ 45 A SSOSA is a special sentencing alternative that suspends the sentences of qualifying sex offenders. RCW 9.94A.670. Before the court orders a SSOSA, a certified sex offender treatment provider evaluates "whether the offender is amenable to treatment." RCW 9.94A.670(3). Generally, the SSOSA evaluation is performed by the Department of Health (DOH). RCW 9.94A.670(1)(a) ; RCW 18.155.020.
¶ 46 The majority concludes that SSOSA evaluations do not " 'directly relate [ ] to [the] patient's health care' " because a SSOSA evaluation's "purpose is to assist the court in determining whether the offender should be granted an alternative sentence instead of jail time."[1] Majority at 11611 (quoting RCW 70.02.010(16) ). In so concluding, the majority injects into the definition of "health care information" a *207 requirement that does not exist: that information " 'directly relates to the patient's health care' " only if it is solely "for the direct purpose of health care." Id. (quoting RCW 70.02.010(16) ). While assisting a court in its sentencing determination is undoubtedly the purpose of a SSOSA evaluation, this does not mean that the information in a SSOSA evaluation is not directly related to a patient's health care. In other words, a SSOSA evaluation can still be directly related to a patient's health care despite its use to aid a court in a sentencing decision.
¶ 47 Nothing in the PRA or UHCIA limits health care information to information that is *1168 used solely for the purpose of obtaining health care. Cf. id. Rather, the information must be "directly relate[d]" to an individual's health care. RCW 70.02.010(16). "Directly" means "purposefully or decidedly and straight to the mark," "plainly and not by implication," or "in unmistakable terms." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 641 (2002). And to "relate" means to have a "logical or causal connection." Id. at 1916. Evaluating the content within a SSOSA evaluation, in addition to its purpose, reveals that SSOSA evaluations contain information directly related to an offender's past, current, and future health care. Accordingly, this information is exempt from disclosure under the PRA.
¶ 48 The DOH requires its evaluators to include a substantial amount of information regarding the offender's current and historical mental, physical, and sexual health in a SSOSA evaluation, including previous medical assessments; "[s]ubstance abuse"; "[p]sychological/physiological tests"; "[a] sexual history, sexual offense history and patterns of sexual arousal/preference/interest"; "[p]rior treatment"; "[a]lcohol and drug abuse"; "[s]tress"; "[m]ood"; "[s]exual patterns"; "[p]ersonal history including: [ ] [m]edical"; "[m]ental health functioning including coping abilities, adaptation style, intellectual functioning and personality attributes"; "[t]he overall findings of psychological/physiological/medical assessment if these assessments have been conducted"
*208 ; "[t]he evaluator's conclusions regarding the appropriateness of community treatment"; "[a] summary of the evaluator's diagnostic impressions"; "[a] proposed treatment plan"; "[a]nticipated length of treatment, frequency and type of contact with providers or affiliates, and supplemental or adjunctive treatment"; "[t]he specific issues to be addressed in treatment and a description of planned treatment interventions including involvement of significant others in treatment and ancillary treatment activities"; and "[r]ecommendations for specific behavioral prohibitions, requirements and restrictions on living conditions, lifestyle requirements, and monitoring by family members and others that are necessary to the treatment process and community safety." WAC 246-930-320.
¶ 49 Additionally, the SSOSA evaluation must include a personalized mental and sexual health treatment plan that addresses and responds to the particular offender's issues by outlining a plan for future health care:
(b) The examiner shall assess and report regarding the offender's amenability to treatment and relative risk to the community. A proposed treatment plan shall be provided and shall include, at a minimum:
(i) Frequency and type of contact between offender and therapist;
(ii) Specific issues to be addressed in the treatment and description of planned treatment modalities;
(iii) Monitoring plans, including any requirements regarding living conditions, lifestyle requirements, and monitoring by family members and others;
(iv) Anticipated length of treatment; and
(v) Recommended crime-related prohibitions and affirmative conditions, which must include, to the extent known, an identification of specific activities or behaviors that are precursors to the offender's offense cycle, including, but not limited to, activities or behaviors such as viewing or listening to pornography or use of alcohol or controlled substances.
RCW 9.94A.670(3).
*209 ¶ 50 Here, SSOSA evaluations contain information that plainly and unmistakably has a direct connection to an offender's past, current, and future health care. For example, the evaluator's findings of an offender's "prior treatment," and "personal medical history" are a record of the offender's past "care, service, or procedure provided by a health care provider" to "treat [ ] or maintain a patient's physical or mental condition." RCW 70.02.010(14), (14)(a). The "proposed treatment plan" is an outline of the offender's needed "care ... provided by a health care provider ... to treat [ ] or maintain [the offender's] physical or mental condition." RCW 9.94A.670(3)(b) ; RCW 70.02.010(14). And, the findings of "psychological/physiological/mental assessment[s]," "the evaluator's diagnostic impressions," "[s]ubstance abuse," "[p]sychological *1169 /physiological tests," and "[m]ental health functioning," are undoubtedly used "by a health care provider" to "diagnose ... a patient's physical or mental condition." WAC 246-930-320 ; RCW 70.02.010(14).
¶ 51 The court's additional use of this information in sentencing does not disassociate the information from the offender's health care. Its diagnostic and treatment purposes remain. Because the SSOSA evaluation includes information directly related to a patient's health care, it is exempt from disclosure under the PRA. RCW 42.56.360(2).
B. Forensic examinations may contain health care information
¶ 52 The majority also concludes that SSOSA evaluations do not contain health care information because they are "forensic examination[s]" rather than medical examinations. Majority at 1161. Even assuming SSOSA evaluations are forensic examinations, they still may and do contain health care information. Consequently, they are exempt from disclosure under the PRA.
¶ 53 In reaching its conclusion that forensic examinations do not contain health care information, the majority relies on *210 State v. Sullivan , 60 Wash.2d 214, 373 P.2d 474 (1962). Majority at 1161. In Sullivan, this court had to determine whether a doctor who observed and treated a defendant pursuant to a court order was subject to the doctor-patient privilege. 60 Wash.2d at 226, 373 P.2d 474. In reaching its conclusion, the court opined that " 'when the examination is made by the physician for the express purpose of publishing the results,' " otherwise known as a "forensic examination," there is no doctor-patient privilege. Id. at 224, 373 P.2d 474 (quoting Strafford v. N. Pac. Ry. Co., 95 Wash. 450, 453, 164 P. 71 (1917) ). Relying on this language, the majority concludes that because "SSOSA evaluations are made for the purpose of publishing the results to the court," SSOSA evaluations "are not subject to the same privacies and privileges [2 ] as medical evaluations." Majority at 1161.
¶ 54 Whether SSOSA evaluations are "published" to the court, does not determine whether they are subject to disclosure under the PRA. Cf. id. When regulating the disclosure of health care information, the legislature recognized that circumstances exist where entities other than health care providers use health care information for purposes other than treatment; however, the legislature made clear that even in those circumstances, individuals retain a privacy interest in their health care information:
Persons other than health care providers obtain, use, and disclose health record information in many different contexts and for many different purposes. It is the public policy of this state that a patient's interest in the proper use and disclosure of *211 the patient's health care information survives even when the information is held by persons other than health care providers.
RCW 70.02.005(4) (emphasis added). As a result, we cannot rely on the fact that SSOSA evaluations are published to the court to determine whether the health care information is subject to public disclosure under the PRA.
¶ 55 Instead, we must rely on the definition of health care information to determine whether SSOSA evaluations contain any information that is protected from disclosure. Any information that is directly related to the diagnosis, treatment, or maintenance of "a patient's physical or mental condition" qualifies as health care information. RCW 70.02.010(14)(a), (16). As discussed above, SSOSA evaluations contain such information. Therefore, the health care information in *1170 SSOSA evaluations is exempt from disclosure under the PRA.
C. Amenability to treatment is a legal determination that necessarily includes health care information
¶ 56 Finally, the majority concludes that SSOSA evaluations do not contain health care information because an offender's amenability to treatment is a legal determination rather than a medical determination. Majority at 1162. To reach this conclusion, the majority again ignores the substance of a SSOSA evaluation, which requires the opinion of a health care provider regarding the defendant's medical receptiveness to treatment. That information is directly related to an offender's health care and thus qualifies as health care information.
¶ 57 Courts are not limited to health care information when deciding whether an offender is amenable to treatment. See, e.g., RCW 9.94A.670(4) ("The court shall give great weight to the victim's opinion whether the offender should receive a treatment disposition under this section."). However, "a mental health care professional's opinion is necessary to determine a defendant's amenability to treatment."
*212 Strauss, 119 Wash.2d at 421, 832 P.2d 78 (emphasis added); see also State v. McNallie, 123 Wash. 2d 585, 592, 870 P.2d 295 (1994) (concluding that "an exceptional sentence cannot be sustained without 'the opinion of a mental health professional that the defendant would likely not be amenable to treatment' ") (quoting State v. Pryor, 115 Wash.2d 445, 455, 799 P.2d 244 (1990) ). Thus, the court's determination of amenability to treatment inevitably contains information directly related to an offender's health care-the opinions, diagnoses, and recommendations of a medical professional regarding the offender's treatment. Consequently, the fact that the court's determination of the offender's amenability to treatment involves consideration of nonmedical information does not negate the presence of the health care information that the determination requires.
II. Plaintiffs may proceed under pseudonyms
¶ 58 I also disagree with the majority's conclusion that the trial court erred by allowing the John Does to proceed in pseudonym for two reasons. First, the trial court appropriately justified its actions under GR 15. Second, article I, section 10 of the Washington State Constitution does not apply and the trial court was not required to consider the Ishikawa[3] factors. As a result, the trial court's order permitting the John Does to proceed in pseudonym was not in error.
A. The trial court justified its order with written findings pursuant to GR 15
¶ 59 A court may order that a record be sealed when it "makes and enters written findings that the specific sealing or redaction is justified by identified compelling privacy or safety concerns that outweigh the public interest in access to the court record." GR 15(c)(2). When identifying compelling privacy concerns justifying sealing or redaction, *213 this court has noted that "a plaintiff may proceed under a pseudonym to protect a privacy interest."[4] N. Am. Council on Adoptable Children v. Dep't of Soc. and Health Servs., 108 Wash.2d 433, 440, 739 P.2d 677 (1987). *1171 ¶ 60 Here, the trial court identified multiple privacy and safety concerns in a written order, which justified the use of pseudonyms:
22. Disclosing the requested SSOSA evaluations maintained by the DOC [Department of Corrections] would not be in the public interest because it would harm victims, discourage sex offenders from seeking and receiving SSOSA evaluations, discourage those offenders who do receive SSOSA evaluations from being candid with their evaluator, make it more difficult for Level I sex offenders to reintegrate, and disclose sensitive health care information.
23. Disclosure of the requested SSOSA evaluations would substantially injure public safety by undermining the SSOSA system and discouraging reintegration of Level I sex offenders. Individuals who receive SSOSA treatment have the lowest recidivism rates for any type of crime, including sex offenses.
24. Disclosure of the requested SSOSA evaluations would substantially injure Plaintiffs by reducing their housing and employment opportunities and by creating the risk that their evaluations could be accessed in a centralized location. Ms. Zink has already posted SSOSA evaluations on a public website.
*214 25. Disclosure of the requested SSOSA evaluations would irreparably harm both Plaintiffs and Plaintiffs' victims because such disclosure could not be undone.
Clerk's Papers at 737-38. The trial court weighed these concerns with the public's interest in knowing the names of parties: "[I]n my order, I did indicate some findings that balanced the public interest in knowing their names against the Plaintiffs' interest in privacy. And so the Court has conducted that balance and the order reflects that." Report of Proceedings (RP) (Oct. 3, 2014) at 22.
¶ 61 The majority does not even acknowledge these findings by the trial court, inexplicably concluding that "the trial court did not justify its actions under GR 15." Majority at 1165. Yet, as stated above, under GR 15, the trial court need only "make[ ] and enter[ ] written findings that the specific sealing or redaction is justified by identified compelling privacy or safety concerns that outweigh the public interest in access to the court record." GR 15(c)(2). The trial court clearly did so in this case. As a result, it appropriately justified its actions under GR 15 and did not err in ruling that the John Does could proceed in pseudonym.
¶ 62 The concurring opinion contends that Hundtofte v. Encarnación[5] controls the outcome of this case. Concurrence at 1. I disagree for two reasons. First, there is no majority opinion in Hundtofte. Then-Chief Justice Madsen concurred in result in the four-justice lead opinion but on different grounds-that GR 15 does not authorize changing the caption of a case in the court index by substituting initials for full names. Hundtofte , 181 Wash.2d at 16, 330 P.3d 168 ; see In re Pers. Restraint of Francis, 170 Wash.2d 517, 532 n.7, 242 P.3d 866 (2010) ("When there is no majority opinion, the holding is the narrowest ground upon which a majority agreed."). As a result, even if we assume that Hundtofte applies, the *215 concurrence is mistaken that Hundtofte controls the issue before us.
¶ 63 The second reason that Hundtofte does not control here is that Hundtofte dealt with a different issue: whether a trial court could order that court records, including the court docket, could be changed to remove the names of parties. 181 Wash.2d at 17, 330 P.3d 168 (Madsen, C.J., concurring). In contrast, here no court records must be changed. Instead, we must determine whether the John Does could use pseudonyms. Given the differences in the relevant issues, Hundtofte is easily distinguishable and inapposite. For example, the trial court in Hundtofte failed to follow the requirements of GR 15. Id. at 18, 330 P.3d 168 (Madsen, C.J., concurring). But here, the trial court complied with GR 15. For these reasons, Hundtofte does not control and this dissent is "not in direct conflict" with that opinion. Concurrence at 1.
B. Article I, section 10 does not apply here because experience and logic allow the use of pseudonyms when privacy and safety concerns outweigh the public interest
¶ 64 The majority further concludes that the trial court erred by not conducting a *1172 proper Ishikawa analysis. Majority at 1163. "Whether an Ishikawa analysis is necessary depends on whether article I, section 10 applies." State v. S.J.C., 183 Wash.2d 408, 412, 352 P.3d 749 (2015). And "[w]hether article I, section 10 applies depends on application of the experience and logic test." Id. Under the experience prong, we consider " 'whether the place and process have historically been open to the press and general public.' " Id. at 417, 352 P.3d 749 (internal quotation marks omitted) (quoting In re Det. of Morgan, 180 Wash.2d 312, 325, 330 P.3d 774 (2014) ). Under the logic prong, we consider " 'whether public access plays a significant positive role in the functioning of the particular process in question.' " Id. at 430, 352 P.3d 749 (internal quotation marks omitted) (quoting Morgan, 180 Wash.2d at 325, 330 P.3d 774 ). *216 ¶ 65 Here, experience shows that the names of plaintiffs historically have not been open to the public when privacy and safety concerns outweigh the public interest.[6] See, e.g., Jane Doe v. Boeing Co., 121 Wash.2d 8, 846 P.2d 531 (1993) (employee used a pseudonym to bring an action against former employer for handicap discrimination); John Doe v. Grp. Health Coop. of Puget Sound, Inc., 85 Wash. App. 213, 932 P.2d 178 (1997), overruled on other grounds by Reid v. Pierce County, 136 Wash.2d 195, 961 P.2d 333 (1998) (using a pseudonym, an employee sued health care provider for the unauthorized disclosure of health care information). The majority dismisses other cases where plaintiffs used pseudonyms because it reasons that the parties in those cases "ha[d] not been convicted of any crime [and] may have a legitimate privacy interest." Majority at 1164. Again, the majority mistakenly relies on its incorrect assumption that as convicted offenders, the John Does do not and cannot have a legitimate privacy interest in the health care information contained in their SSOSA evaluations. As discussed above, this premise is false. All patients have a legitimate privacy interest in preventing the unauthorized disclosure of their health care information; that privacy interest is not contingent on whether a patient is a convicted offender or not. See RCW 70.02.005 (emphasizing the importance of protecting health care information and making no mention of the criminal status of the patient).
¶ 66 In addition, logic supports the John Does' use of pseudonyms in this case. When privacy and safety concerns outweigh the public's interest, allowing the use of pseudonyms permits plaintiffs to seek relief while still protecting *217 their privacy and ensuring safety. See, e.g., State v. Ward, 123 Wash.2d 488, 494 n.2, 869 P.2d 1062 (1994) ("Appellant brought this action under a pseudonym, claiming that public disclosure of his true name would effectively deprive him of the relief sought."); N. Am. Council on Adoptable Children, 108 Wash.2d at 440, 739 P.2d 677 (stating that "a plaintiff may proceed under a pseudonym to protect a privacy interest"). The public does not require the John Does' real names to fulfill its important role to "scrutinize the sentences given to offenders" or to "ensure the court is following the sentencing statutes, is not overly deferential in granting SSOSA sentences, or is denying SSOSA sentences where warranted." Majority at 1165.
¶ 67 In reaching a contrary conclusion, the majority ignores the numerous other sources of SSOSA-related information that are subject to public disclosure. The trial court does not limit itself to health care information when evaluating whether an offender qualifies for a SSOSA sentence:
[T]he court shall consider whether the offender and the community will benefit from use of this alternative, consider whether the alternative is too lenient in light of the extent and circumstances of the offense, consider whether the offender has victims in addition to the victim of the *1173 offense, consider whether the offender is amenable to treatment, consider the risk the offender would present to the community, to the victim, or to persons of similar age and circumstances as the victim, and consider the victim's opinion whether the offender should receive a treatment disposition under this section.
RCW 9.94A.670(4). Absent another applicable exemption, the non-health care information in a SSOSA evaluation used by the court to sentence an offender, like the risk of the offender to the community or the offender's past similar offenses, is open to public scrutiny. Actual SSOSA sentences are also available to the public for examination, as are the court's reasons for imposing a SSOSA, which must be entered in writing. RCW 9.94A.670(4) (stating that the court must "enter written findings stating its reasons for *218 imposing the treatment disposition"). The public has several sources of available information to it; it does not also require the John Does' real names to fulfill its important role.
¶ 68 Because both experience and logic allow plaintiffs to use pseudonyms when privacy and safety concerns outweigh the public's interest, article I, section 10 does not apply. As a result, the trial court was not required to perform an Ishikawa analysis.[7]
CONCLUSION
¶ 69 SSOSA evaluations contain health care information and that information is exempt from disclosure under the PRA. RCW 42.56.360(2). In addition, the trial court did not run afoul of GR 15 or article I, section 10 when it permitted the John Does to proceed in pseudonym. I would affirm the Court of Appeals. As a result, I respectfully dissent.
Gordon McCloud, J.

Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 37-39, 640 P.2d 716 (1982).

Whether a doctor-patient privilege exists has no bearing on the relevant inquiry of whether SSOSA evaluations contain information directly related to a patient's health care. Neither the PRA nor the UHCIA requires the existence of a doctor-patient privilege to protect health care information from disclosure. In fact, the statutes do not even require that the health care information be between a doctor and patient in order for that information to be protected. RCW 70.02.020 ("[A] health care provider, an individual who assists a health care provider in the delivery of health care, or an agent and employee of a health care provider may not disclose health care information about a patient to any other person without the patient's written authorization."). Consequently, the evaluations are exempt from disclosure under the PRA, even if they do not possess the traditional doctor-patient privilege of medical examinations.

Seattle Times Co. v. Ishikawa, 97 Wash.2d 30, 640 P.2d 716 (1982).

Even assuming that the John Does have a lessened privacy interest because they have been convicted of criminal offenses, their convictions do not subject them to unauthorized disclosures of health care information. Cf. majority at 1164. The majority points to no authority to support its contention that "convicted sex offenders" do not have "a legitimate privacy interest to protect in this case." Id. To the contrary, the legislature has recognized the overriding public interest of the State in protecting all health care information from unauthorized disclosure: "Health care information is personal and sensitive information that if improperly used or released may do significant harm to a patient's interests in privacy, health care, or other interests": "[i]t is the public policy of this state that a patient's interest in the proper use and disclosure of the patient's health care information survives even when the information is held by persons other than health care providers." RCW 70.02.005(1), (4). The John Does' criminal status does not alter the definition of health care information or its accompanying protections.

181 Wash.2d 1, 16, 330 P.3d 168 (2014).

The majority mistakenly frames the issue as whether "the names of people convicted of criminal offenses, including sex offenders, have historically been open to the public." Majority at 1164. The names of the John Does, as well as their convictions, are already open to the public. The question here is whether sufficient privacy and safety concerns outweigh the public's interest in knowing the names of convicted offenders trying to prevent the unauthorized disclosure of their health care information. See GR 15(c)(2). As discussed above, the trial court concluded that there were sufficient privacy and safety concerns that outweighed the public interest in this case to justify the use of pseudonyms.

Even though it was not required, the trial court indicated that it did consider the Ishikawa factors when it made its ruling that granted the John Does' request to use pseudonyms. RP (Oct. 3, 2014) at 22 ("I did consider the Ishikawa and Bone-Club factors ... I'm sort of by analogy determining that it's appropriate for the Court to consider the open courts and public access to information cases in determining the ability to go forward with the John Doe G, H, and J pseudonyms.").